**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Cash Joseph BONAS, Defendant–Appellant.**

**No. 02–50631.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 2003.

Filed Sept. 17, 2003.

---

Kenly Kiya Kato, Deputy Federal Public Defender, Los Angeles, CA, argued for the appellant. Maria E. Stratton, Federal Public Defender, joined her on the briefs.

Andrea L. Russi, Assistant United States Attorney, Los Angeles, CA, argued for the appellee. Debra W. Yang, United States Attorney, and Jacqueline Chooljian,

Assistant United States Attorney, joined her on the brief.

Before KOZINSKI, T.G. NELSON, Circuit Judges, and RESTANI,* Judge.

## OPINION

KOZINSKI, Circuit Judge:

We consider whether the record supports the district court's finding of manifest necessity justifying a mistrial. We conclude that it does not.

### Facts

Cash Bonas is a lawyer who filed a class-action suit against three supermarket chains—Ralph's, Von's and Lucky's—alleging price-fixing of eggs. The supermarkets were represented in that litigation by a cadre of name-brand Los Angeles law firms. Bonas and his client lost after a jury trial. According to the government, Bonas then began harassing defense counsel with a barrage of e-mails and voicemail messages. The messages increased in frequency and intensity, leading the firms to tighten their security and even add armed guards.

The government indicted Bonas for violating 18 U.S.C. § 875(c) by making threats in interstate commerce. Trial commenced and was expected to last three to four days. On the first day, the district court empaneled a twelve-person jury and two alternates, and the government began its case. On the following morning, the district judge made the unexpected announcement that "the jury service people

did not make [an] inquiry [into possible financial hardship], and for that reason, as soon as we selected the jurors to serve, two or three of them at that time informed us for the first time that they are not going to be paid by their employers." E.R. at 270. The judge explained that he had investigated the matter and determined that four of the jurors were not being compensated by their employers. The judge also explained that the employers had been contacted but were steadfast in their refusal to pay the jurors for their days of jury duty. The judge stated that he had consulted the former chief district judge about ways to compensate the jurors and had even tried, unsuccessfully, to get the clerk's office to pay them. The judge expressed concern that forcing the jurors to serve without pay would "adversely affect the parties" and undermine the likelihood of a fair trial. E.R. at 272. He proposed declaring a mistrial, but Bonas objected. The government took the position that it neither supported nor objected to a mistrial. It did urge the district judge to "just utter the magic words, that the court finds that manifest necessity exists." The judge replied "I certainly will find that, yes" and declared a mistrial. E.R. at 274.

Shortly thereafter, Bonas filed a motion to dismiss, arguing that a retrial would violate his rights under the Double Jeopardy Clause. The district court denied the motion, and Bonas now appeals.[1] We have jurisdiction over this interlocutory appeal. *Abney v. United States*, 431 U.S. 651, 663, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

### Analysis

■ It is long established that "[c]riminal defendants have a right to have

---

* The Honorable Jane A. Restani, United States Court of International Trade, sitting by designation.

1. The district court stayed proceedings pending the outcome of the appeal, but retained Bonas in custody. Shortly after submission of this case, we ordered Bonas released.

the jury first empaneled to try them reach a verdict." *United States v. Bates,* 917 F.2d 388, 392 (9th Cir.1990) (citing *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)). If a case is dismissed after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime only in two circumstances: (1) if he consents to the dismissal; or (2) if the district court determines that the dismissal was required by "manifest necessity." *Id.* at 392 (citing *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)).[2]

 Bonas did not consent, so only the second of these grounds is arguably applicable. And, as noted, the district court stated that it "certainly" did find manifest necessity. We review this finding for abuse of discretion, *id.* at 394, although we have stated somewhat delphically that "the degree of deference" we accord the district court's determination of manifest necessity "varies according to the circumstances of each case." *Id.*[3]

 Review for abuse of discretion calls for a judgment as to whether the district court's decision (here, finding mistrial warranted by manifest necessity) is one that a rational jurist could have made based on the record presented to him. *See Washington,* 434 U.S. at 514, 98 S.Ct. 824; *Bates,* 917 F.2d at 395; *see also United States v. Meza–Soria,* 935 F.2d 166, 171 (9th Cir.1991). This process presupposes that there is, indeed, a record of the evidence the district court considered in making its decision; if the district court exercises discretion based on facts outside the record, that alone may constitute an abuse of discretion. *See Price Bros. Co. v. Philadelphia Gear Corp.,* 649 F.2d 416, 419 (6th Cir.1981) ("The fair and impartial administration of justice demands that facts be determined only upon the evidence properly presented on the record."); *United States v. Ashe,* 176 F.2d 606, 607 (3d Cir.1949) ("a district court ... must base its decision on evidence actually in the record"); *Moore v. Russell,* 294 F.Supp. 615, 621 (E.D.Tenn.1968) (finding a due process violation where "[a]ll the evidence forming the foundation for the exercise by the trial judge of judicial discretion emanated from outside the record of the trial").

In attempting to conduct our review, we are immediately confronted with the prob-

---

**2.** Bonas cites *United States v. Sammaripa,* 55 F.3d 433 (9th Cir.1995), for the proposition that a finding of manifest necessity may not be based on circumstances that could have been discovered before the jury was empaneled. *Sammaripa* involved a belated *Batson* challenge by the government after jeopardy attached. We held that, because the government had all the necessary information to make the challenge during jury selection, any *Batson* violation could not be the basis for a finding of manifest necessity. *Id.* at 435.

Our case is distinguishable because the prosecutor did not know that the four jurors had financial problems. She could, of course, have suggested voir dire questions to discover that fact, but she reasonably relied on the standard practice in the Central District of screening jurors for financial hardship. Because we resolve the case in favor of Bonas on another ground, we need not decide whether this distinction renders *Sammaripa* inapplicable.

**3.** Manifest necessity is occasionally referred to as a "finding," but that designation reflects convenience rather than accuracy. It is quite clear from our cases that a determination of manifest necessity is an exercise of discretion, reviewed for abuse, not a finding of fact. Discretion must, of course, be informed by a factual record, and there may well be conflicts in the evidence that the court must resolve on its way to exercising discretion. If the district judge resolves disputes in the evidence, such preliminary factual findings will be reviewed for clear error. *Kimbro v. Atl. Richfield Co.,* 889 F.2d 869, 873 (9th Cir. 1989).

lem that the record contains no evidence supporting the district court's determination of manifest necessity. Everything we know about the four jurors who were not getting paid by their employers comes from the district judge. The judge, of course, was not a witness. *See* Fed. R.Evid. 605. Moreover, it is unclear whether the judge obtained his information directly from the four jurors, or through one or more layers of hearsay.[4] It is thus difficult to know what the jurors actually said, or what, if anything, they were told.

There may well be peripheral factual matters a district judge may rely on without making a formal record—for example, matters pertaining to the internal operation of the court. Thus we readily accept some of the judge's statements pertaining to internal court communications and procedures—such as the representation that court personnel normally screen jurors for financial hardship, but neglected to do so in this case. Similarly, we accept the district judge's description of the efforts he made to obtain compensation for the jurors. Even the calls to the jurors' employ-

ers might be adequately documented by the district judge's representation that the employers were contacted by court staff and definitively refused to pay.[5]

A formal record must be present, however, when the issue is communications with the jurors themselves. The jurors' ability to serve impartially for the remainder of the trial is at the heart of the district judge's determination of manifest necessity, yet, without a record of what they actually said and thought, we have no way of reviewing whether the district judge's decision to declare a mistrial was a sound exercise of discretion. Even putting aside the potential unreliability of the district judge's account due to the possibility that his information may have been filtered through one or more layers of his staff, the judge simply does not tell us enough to support a finding of manifest necessity. Based on the district court's various statements—and assuming them all to be a fair and full description of what the jurors told him—we know only the following: (1) four of the jurors were not being paid by their employers during jury

---

4. The judge twice referred to conversations with the jurors, and in neither case did he make it clear whether he talked to them himself. As to the first conversation, the judge was not even certain how many jurors were involved, so it is likely he was reporting what others had told him: "[A]s soon as we selected the jurors to serve, two or three of them at that time informed us for the first time that they are not going to be paid by their employers." E.R. at 270. With respect to the second conversation, the judge stated: "We've contacted or made contact with the four jurors, asking them whether they can continue to serve without pay from [their] employer[s], and their answer was firmly no." E.R. at 272. It is unclear whether the judge here was using "we" as a euphemism for "I," or whether he meant that he had contacted the jurors using members of his staff as intermediaries.

5. There is no clear line dividing those matters as to which record evidence is needed, and those the district court may deem established based on other sources. The factors to be balanced are the inconvenience to the court and the centrality of the issue to the matter in dispute. A judge may reasonably conclude that it is unnecessary and intrusive to put his own staff on the stand to testify about normal courthouse procedures, or about routine telephone calls made to confirm administrative details such as the employment status or address of a juror. The balance would be struck quite differently if a member of the courthouse staff were alleged to have discussed the case with the jurors while they were being escorted to lunch. In a case such as that, where the factual question goes to the heart of the jury's impartiality, administrative convenience cannot outweigh the need to make a factual record through the normal means of sworn testimony in open court.

service; and (2) they were unwilling to serve without pay, presumably because this caused them financial hardship. But as we said in *United States v. Echavarria–Olarte*, 904 F.2d 1391, 1395 (9th Cir.1990), "[i]t is not so clear that a juror claiming financial hardship is unable to perform his duty as a juror."[6] Financial hardship is not always an adequate basis for being excused from jury service. Serving is a public duty, and only severe hardship can form the basis for excusing a member of the venire. *Thiel v. S. Pac. Co.*, 328 U.S. 217, 224, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). Once the jury is empaneled and sworn, jeopardy attaches. *Crist v. Bretz*, 437 U.S. 28, 35, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). Thereafter, even severe hardship may not be sufficient to justify excusing an empaneled juror, particularly if doing so will result in a mistrial. The defendant's right to proceed to verdict with the jury first selected can only be set aside if the district judge reasonably concludes that the hardship is so severe that it fatally undermines the juror's ability to discharge his responsibilities diligently and impartially.

Here, we have no evidence—not even the district judge's possibly-hearsay report—that all four jurors were unwilling to put aside their unhappiness at having to serve without pay and discharge their duties as instructed by the court. Nor is it out of the question that the jurors could have done so. The trial was estimated to last only three to four days, and two of those days had already passed. We cannot presume that the jurors, if properly admonished by the court as to their civic responsibilities, would have been unwilling to do their duty for the one to two additional days it would have taken to complete the trial.

This is not a case where there was no plausible alternative to relying on the district judge's in camera observations. The four jurors could have been brought into court, singly or as a group, and questioned about their financial situation and willingness to proceed despite any hardship. *See United States v. Ivester*, 316 F.3d 955, 958–59 (9th Cir.2003). If he deemed it necessary, the judge could even have excused the parties. *See Parker v. United States*, 404 F.2d 1193, 1197 (9th Cir.1968). The court could have questioned the jurors as to how much they earned and the effect on their personal finances of losing a few days' work; this would have documented the severity of the hardship. The court could also have reminded the jurors of their obligation to set aside their unhappiness and perform their civic duty. It is entirely possible that at least two of the four would have been willing to proceed, in which case the alternates could have been called upon to fill in for the one(s) who were not.

Had the district judge concluded, after questioning the jurors on the record, that

---

**6.** In *Echavarria–Olarte* we noted that whether a juror suffering financial hardship is unable to perform his duties is a question "peculiarly suited to the exercise of discretion by the trial judge." 904 F.2d at 1395. This is consistent with our cases holding that a determination of manifest necessity is a matter of discretion for the district court. *Echavarria–Olarte* did not, however, involve a finding of manifest necessity because an alternate was available to fill in for the juror suffering financial hardship. Thus the question presented there was not whether to grant a mistrial but whether to allow a substitution pursuant to Rule 24(c) of the Federal Rules of Criminal Procedure. A court might reasonably find unavailability based on financial hardship that would permit substitution of an alternate under Rule 24(c) in circumstances where a finding of manifest necessity could not be sustained. Depriving a defendant of the entire jury panel and subjecting him to a new trial is by far a weightier decision than substituting one of the alternates for one of the empaneled jurors.

he could not trust them to be impartial, we would accord this determination substantial deference, commensurate with the judge's ability to observe the jurors and gauge the sincerity of their responses. We could then have satisfied ourselves that the right questions were asked, the appropriate admonitions were given and less drastic alternatives were considered and discarded. On the record as it stands, we can only guess. We do not even know whether the judge spoke to the jurors himself, what questions he asked them, what admonitions he may have given them or how they responded. While we do know that the district judge was convinced the four jurors could not be impartial, we cannot confirm that this was a rational conclusion based on what the four jurors actually said. We thus have no way to review the district court's exercise of discretion.

It was not defendant's burden to insist that the district court make a better record supporting its grant of a mistrial. Defendant had a constitutional right to proceed to verdict with the jury empaneled in his case. If the district court thought it necessary to deprive him of that right, it had the responsibility to establish a factual basis supporting that action. And, if the government wished to retain the right to retry defendant before another jury, it had both the duty and the incentive to ensure that the court's finding of manifest necessity was supported by evidence on the record. The court, in fact, announced its inclination to declare a mistrial, then took a recess to allow the parties to consider the matter. After the recess, the Assistant United States Attorney advised the district court that it could dismiss simply by "utter[ing] the magic words, that the court finds that manifest necessity exists." But this is not a Harry Potter novel; there is no charm for making a defendant's constitutional rights disappear. By bypassing

the opportunity to urge the district court to make a record supporting its finding of manifest necessity, the government forfeited the right to try the defendant again.

The government will be precluded from retrying the defendant after an improper mistrial even if it has no opportunity to suggest the court make a better record, and even where the mistrial is granted over the government's vigorous objection. *See Bates*, 917 F.2d at 390–91, 398. A fortiori, the government will be bound where, as here, the court gave the parties an opportunity to advise it as to the proper procedure and the government did not seize that opportunity.

We reverse the district court's judgment and remand for dismissal of the indictment with prejudice.

REVERSED and REMANDED.