**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

    v.

DANIEL CHAPMAN; SEAN FLANAGAN;
HERBERT JACOBI,
        *Defendants-Appellees.*

No. 06-10316

D.C. No.
CR-03-00347-JCM

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

DANIEL CHAPMAN; SEAN FLANAGAN;
HERBERT JACOBI,
        *Defendants-Appellants.*

No. 06-10610

D.C. No.
CR-03-00347-JCM

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
August 13, 2007—San Francisco, California

Filed May 6, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

4937

**COUNSEL**

Steven W. Myhre, Acting United States Attorney; Robert L. Ellman, Appellate Chief and Assistant United States Attor-

ney, District of Nevada, for the government-appellant-cross-appellee.

Daniel G. Chapman, Las Vegas, Nevada (pro se); Sean P. Flanagan, Las Vegas, Nevada (pro se); James L. Sanders, McDermott Will & Emery LLP, Los Angeles, California; and Maranda E. Fritz, Hinshaw & Culbertson LLP, New York, New York, for the defendants-appellees-cross-appellants.

---

## OPINION

WARDLAW, Circuit Judge:

The district court dismissed an indictment against Daniel Chapman, Sean Flanagan, and Herbert Jacobi (collectively "Defendants") after the prosecution admitted that it had failed to meet its obligations to disclose over 650 pages of documents to the defense. We must decide whether the government's appeal of the dismissal is precluded by the Double Jeopardy Clause of the Fifth Amendment, *see* 18 U.S.C. § 3731, whether the dismissal was proper, and whether Defendants are entitled to fees and costs under the Hyde Amendment, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A Note). We conclude that the Double Jeopardy Clause does not bar the government's appeal under the circumstances presented here, and we affirm as to both the dismissal of the indictment and the denial of fees and costs.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On August 8, 2003, a grand jury in the District of Nevada returned a sixty-four-count indictment charging that Defendants, along with Shawn Hackman and James Farrell (who both pled guilty before trial), concocted a complex securities trading scheme known as a "box job," where a small number

of individuals secretly control a corporation's shares and manipulate the stock price through strawmen officers, directors, and shareholders.[1] In this box job, Defendants allegedly created multiple shell corporations, back-dated corporate records to make their activities appear lawful, and named dummy directors and officers who had no actual control over the corporations and in some cases did not even know of their existence. According to the government, Defendants duped the National Association of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC") into approving their corporations for listing on the Over-the-Counter Bulletin Board ("OTCBB") stock exchange. OTCBB listing is a valuable asset, and these newly approved shell corporations could be merged with third-party business enterprises to create a public market in the shares of those enterprises. By selling and merging these shell corporations, Defendants allegedly made over $12 million, which they laundered through Flanagan and Chapman's law firm and various corporations that Jacobi had registered in the Bahamas.

## A.    *Events Leading up to the Mistrial Ruling*

On April 9, 2004, the government agreed that it would disclose various documents prior to trial, including (1) all "criminal history and other background information regarding Government witnesses that is material and reasonable," (2) any evidence favorable to Defendants material to their guilt or innocence, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), (3) any promises, inducements, or threats made to witnesses to gain cooperation in the investigation or prosecution, as required by *Giglio v. United States*, 405 U.S. 150 (1972), and (4) any witness statements required to be disclosed under *Jencks v. United States*, 353 U.S. 657 (1957),

---

[1]A superseding indictment, naming only Chapman, Farrell, Flanagan, and Jacobi as defendants, was filed on May 18, 2004. A second superseding indictment, which added various "Sentencing Allegations," was filed on July 27, 2004.

and 18 U.S.C. § 3500. Over the next 22 months, the government claims to have turned over close to 400,000 pages of documents.

There were, however, early indications that the government had not fully complied with its discovery obligations. On January 23, 2006, one day before the trial was set to begin, the government announced that it would present its case agent, Michael Payne, to testify. Defendants objected that Payne was not on the witness list and that none of his statements, memoranda, or notes has been disclosed, as required by *Jencks*, 353 U.S. 657, and 18 U.S.C. § 3500. The lead Assistant United States Attorney ("AUSA") disagreed and represented to the court that all materials relating to Payne had been turned over. Over the defense's continued protestations, the district judge stated that the AUSA "says that he's done it." In the end, the court noted that if Payne "tries to testify, and there's material that [the prosecution] hasn't turned over, then his testimony will be stricken."

Other hints of discovery violations surfaced. On February 3, the AUSA elicited testimony from a prosecution witness, Lewis Eslick, about a prior conviction. Defendants objected that they had not received information from the government about that conviction and that this was the second time this had occurred (the day before, the AUSA had attempted to elicit information about a prior conviction from Doug Ansell on redirect examination, but the court sustained an objection that it was beyond the scope of the cross-examination). The district court struck the questioning as unduly prejudicial and reminded the AUSA of his obligation to disclose such material.

On February 6, in the trial's third week, matters came to a head. While the government's twenty-fifth witness, Michael Haynes, was testifying for the prosecution, the AUSA inquired about a prior conviction. Defendants again objected, claiming they had not been provided with the relevant mate-

rial under *Brady* and *Giglio*. The AUSA originally responded that he did not believe the defense objection was "accurate." However, when the district court asked for proof and proposed a brief recess so that the government could produce documentation showing that the relevant material had been disclosed, the AUSA abruptly changed course:

> AUSA: Your Honor, if I could just advise the Court in an abundance of caution rather than find the record of what we turned over, we'll make another copy of everything right now and provide it to the defense counsel immediately.

> COURT: Well, but it's supposed to be turned over. It's not a matter of doing it now.

The judge declared a brief recess and the court reconvened outside the presence of the jury. The following exchange took place:

> AUSA: Your Honor, we cannot find a record of making this information available to defense counsel. We believe, however, that we did or it was certainly our intention to do so.

> COURT: But your belief isn't good enough. This stuff has to be disclosed to them.

> AUSA: And we've disclosed it now, your Honor.

> COURT: Well, I understand, but that's late. I'm [not] going to say it's to[o] late, but it's late.

> AUSA: Your Honor, we apologize.

> COURT: Okay, I want this stuff—this stuff is going to be produced or I'm going to start striking testimony or worse.

Defense counsel walked the court through various discovery violations up to that point and urged it to impose immediate sanctions. The AUSA acknowledged that "there are some additional witnesses that do have criminal histories and convictions. . . . What we will do is that we will make full copies of . . . any charging documents, plea agreements, for any of the remaining witnesses and have that available for defense counsel this evening."

## B. *Mistrial Hearing*

The next day, Chapman's attorney alerted the court to hundreds of pages of documents that the government had delivered that morning and the previous evening. They totaled some 650 pages and consisted of rap sheets, plea agreements, cooperation agreements, and other information related to numerous government witnesses, including at least three important witnesses whose testimony was already complete. Chapman's attorney provided the court with a thirty-four-page sampling of some of the disclosed documents, entitled "Hearing Exhibit 1." Counsel explained that he had not had a chance to review the newly disclosed material carefully, but that it included conviction records for many government witnesses, including several who had already testified and been released. He further pointed to dates on some of the disclosed "rap" sheets, which showed that the government had not even inquired as to those witnesses' criminal records until after the trial had begun. Counsel argued that the defense had been prejudiced by this failure to timely disclose the *Brady* and *Giglio* material; that recalling the prior witnesses was impractical and would not cure the error; and that a mistrial would only reward the government by giving them a second chance to try their case; therefore, dismissal of the indictment was the only appropriate remedy. Jacobi's attorney agreed, asserting that these late disclosures made the trial "nothing more than a colossal waste of everybody's time."

In response, the AUSA represented that much of the material under discussion had already been disclosed to the

defense, but admitted that he could not prove what information had been disclosed because his office had not kept a log of what materials the government had turned over. He assured the district court, however, that he had made his best effort to comply with the government's obligations. The AUSA argued that neither a mistrial nor a dismissal of the indictment was the appropriate remedy. He urged that the court allow defense counsel sufficient time to review the documents and to recall as necessary any witnesses who had already testified.

The district court expressed frustration, lambasting the prosecutor's conduct as "unconscionable." Based on the material contained in Hearing Exhibit 1, the judge stated, "I don't see any way this trial can go forward. We're in the third week of it, so I say that regrettably." He noted that he was inclined to dismiss the indictment, but deferred ruling on the motion to dismiss until the parties had a chance to brief the issue. The district court then declared a mistrial, dismissed the jury, and ordered briefing on Defendants' motion to dismiss the second superseding indictment.

## C.   *Hearing on the Motion to Dismiss the Indictment*

On February 27, the parties reconvened. Two new AUSAs appeared on behalf of the government to argue against dismissal. The district court listened to argument and then granted Defendants' motion to dismiss, finding that the original AUSA had acted "flagrantly, willfully, and in bad faith."[2] The court noted that the government's case to date had been quite weak and that the defendants would suffer substantial prejudice if the case were retried because "the government

---

[2]Despite finding that the AUSA acted "flagrantly, willfully, and in bad faith," the district court judge also stated that he "refuse[d] to believe . . . the government would intentionally withhold documents . . . ." Drawing a somewhat confusing distinction, he "found that the government did not act intentionally" but also "did not find that the government acted unintentionally."

and its witness[es] will not make [the same] mistake[s] again." It concluded that the government should not be permitted "to try out its case identifying any problem area[s] and then correct those problems in a retrial." It further concluded that the government's discovery violations "subvert[ed] the due process rights that the defendants are guaranteed by the Constitution" and also the "Sixth Amendment right to confront adverse witnesses." Accordingly, the court granted Defendants' motion.

After the indictment was dismissed, the AUSAs asked to place into the record all 650 pages of the recently disclosed documents. On May 11, 2006, the court issued a written judgment of dismissal of the indictment. The government timely appeals.

## II. JURISDICTION

Because dismissal of an indictment is a final decision of the district court, *United States v. Simpson*, 813 F.2d 1462, 1464 (9th Cir. 1987), we generally have jurisdiction under 28 U.S.C. § 1291. However, we lack jurisdiction if permitting the government to appeal would violate the Double Jeopardy Clause of the Fifth Amendment. 18 U.S.C. § 3731; U.S. Const. amend. V.

## III. DISCUSSION

### A. *Double Jeopardy*

[1] The Criminal Appeals Act grants jurisdiction to the federal courts of appeals to entertain criminal appeals by the United States, except "where the double jeopardy clause of the United States Constitution prohibits further prosecution." 18 U.S.C. § 3731. Appellees contend that the district court's sua sponte declaration of a mistrial bars any further prosecution of them, and that we therefore lack jurisdiction to hear this appeal. Because we conclude that, under the circum-

stances here, a new trial is not barred by the Double Jeopardy Clause, we have jurisdiction over the government's appeal.

**[2]** The Double Jeopardy Clause mandates that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Criminal defendants have a right to have the jury first impaneled to try them reach a verdict." *United States v. Bates*, 917 F.2d 388, 392 (9th Cir. 1990). When an initial prosecution ends in mistrial, a subsequent retrial will increase the emotional and financial burden imposed on the defendant, and may give the state an unfair opportunity to tailor its case based on what it learned the first time around. *Arizona v. Washington*, 434 U.S. 497, 503-04 & n.14 (1978). "Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 505.

**[3]** "If a case is dismissed after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime only in two circumstances: (1) if he consents to the dismissal; or (2) if the district court determines that the dismissal was required by 'manifest necessity.' " *United States v. Bonas*, 344 F.3d 945, 948 (9th Cir. 2003). The "manifest necessity" exception applies whenever the judge believes to a "high degree" that a new trial is needed, *Washington*, 434 U.S. at 505-06, although the "classic basis for a proper mistrial" under this exception is a deadlocked jury, *id.* at 509. Because we hold that the "manifest necessity" exception applies in this case, we need not consider whether Defendants "impliedly consented" to the mistrial. *See Bates*, 917 F.2d at 392.

**[4]** "[T]he district court [is] not required to make an explicit finding of manifest necessity or to articulate on the record all the factors which informed its discretion." *United States v. Smith*, 621 F.2d 350, 351 (9th Cir. 1980) (citing *Washington*, 434 U.S. at 516-17). In *Washington*, the Supreme Court considered whether an Arizona state court's declaration of mis-

trial following improper and prejudicial comments by defense counsel barred further prosecution or whether manifest necessity for the mistrial ruling existed. 434 U.S. at 498. "The trial judge did not expressly find that there was 'manifest necessity' for a mistrial; nor did he expressly state that he had considered alternative solutions and concluded that none would be adequate." *Id.* at 501. Washington subsequently filed a habeas petition in federal court, alleging that a new trial would violate the Double Jeopardy Clause. *Id.* The federal district judge granted the writ, noting that the record showed neither a finding of manifest necessity nor a review of the alternatives short of a mistrial. *Id.* at 501-02. A three-judge panel of our Court affirmed, explaining that the state court (1) never made an explicit finding of "manifest necessity," (2) did not explicitly describe his reasons for granting the mistrial, and (3) did not consider alternatives on the record. *Washington*, 546 F.2d at 832. Reversing the panel's opinion, Justice Stevens wrote for the Court:

> The basis for the trial judge's mistrial order is adequately disclosed by the record, which includes the extensive argument of counsel prior to the judge's ruling. The state trial judge's mistrial declaration is not subject to collateral attack in a federal court simply because he failed to find "manifest necessity" in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion.

*Washington*, 434 U.S. at 517. Noting that the trial court was institutionally best positioned to judge the impact of the error on the jury, the Court held that the mistrial declaration did not bar retrial. *Id.* at 513-14, 517.

A judicial determination of manifest necessity is reviewed for abuse of discretion, but the level of deference varies according to the circumstances in each case. *Bonas*, 344 F.3d at 948. Where there is evidence that the prosecution sought

the mistrial for tactical advantage, a judicial determination of "manifest necessity" is reviewed with "the strictest scrutiny." *Washington*, 434 U.S. at 508. In contrast, where the judge's determination is based on his or her own observations and personal assessment that a fair trial would be impossible, that view must be given special deference. *See id.* at 510-11 (giving "special respect" to judge's determination of manifest necessity when based on jury bias). Here, the prosecution strenuously objected to the judge's declaration of a mistrial, and we do not believe the government's *Brady* and *Giglio* violations were committed as part of an effort to retry the case before a different jury. We therefore review the district court's ruling under the more deferential standard.

Under this deferential standard of review, we must ensure that the lower court exercised "sound discretion." *Bates*, 917 F.2d at 394. A determination of manifest necessity may be upheld even if other reasonable trial judges might have proceeded with the trial despite the error. *Washington*, 434 U.S. at 511. Our review should weed out "irrational or irresponsible behavior by the trial judge," *Bates*, 917 F.2d at 395, and accordingly we focus on the procedures employed by the judge in reaching his determination. We consider whether the district court "(1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chose[ ] the alternative least harmful to a defendant's rights, [and/or] (3) acted deliberately instead of abruptly. . . ." *Id.* at 396 (rejecting district court's determination of manifest necessity where the judge acted abruptly, without a hearing, and without considering plausible alternatives).[3] Finally, the district court's judgment must be based on

---

[3]*Bates* also provides a fourth potential consideration: whether the judge "properly determined that the defendant would benefit from the declaration of mistrial." 917 F.2d at 396. It is difficult to assess how this factor should be weighted in light of the Supreme Court's somewhat conflicting discussions of this issue. *Compare Gori v. United States*, 367 U.S. 364, 369 (1961), *with Illinois v. Somerville*, 410 U.S. 458, 471 (1973), *and*

evidence presented in the record. *Bonas*, 344 F.3d at 948-51 (rejecting a district court's judgment of manifest necessity that was based on private conversations between the judge and jurors).

**[5]** Here, as in *Washington*, the district judge did not make an explicit finding of "manifest necessity," but he made clear that he believed the trial could not continue. The judge held a hearing to determine the appropriate sanction, at the conclusion of which he said, "All right. *I don't see any way this trial can go forward*. We're in the third week of it, so I say that regrettably." Later, he repeated: "I'll be candid with the parties because *there's no way this can go on. There's no way this trial can go on*." Finally, when dismissing the jury, the judge said "I do this with a good deal of regret, *but I feel the Court simply has no other alternative*. So I'm going to declare a mistrial . . . ." These statements clearly demonstrate that the judge believed a fair verdict was impossible and that a mistrial was required to at least a "high degree" of necessity. *See Washington*, 434 U.S. at 506. We therefore review this finding of manifest necessity for abuse of discretion, asking whether it was "one that a rational jurist could have made based on the record presented to him." *Bonas*, 344 F.3d at 948.

The record demonstrates that the district judge understood, and considered, a wide range of alternative remedies to mistrial. When the defense first claimed that *Jencks* materials for witness Michael Payne had been withheld, the judge took the AUSA at his word that the information had been turned over, but noted that if Payne "tries to testify, and there's material

---

*United States v. Jorn*, 400 U.S. 470, 483 (1971) (plurality opinion). We need not resolve this apparent conflict here, however, because our analysis under the first three *Bates* factors convinces us that the trial judge did not abuse his discretion in finding that a mistrial was manifestly necessary. Because the fourth *Bates* factor would only bolster this conclusion, we feel comfortable bypassing it.

that [the prosecution] hasn't turned over, then his testimony will be stricken." When the government first admitted that it had no record of certain documents being disclosed to the defense, the judge demanded that "this stuff . . . be produced or I'm going to start striking testimony or worse." Finally, when the full scope of the government's discovery violations was uncovered and the district court held a hearing to discuss the appropriate remedy, the AUSA proposed two lesser alternatives to mistrial: (1) granting a continuance to give the defense time to review the newly disclosed documents, and (2) allowing the defense to recall government witnesses that had already testified if it wished to impeach them with newly disclosed evidence.

**[6]** The district court acted deliberately and offered both sides a chance to argue the merits of alternative remedies. The judge considered, and rejected, the prosecution's proposed continuance for the defense to review the new material:

> I can't take a break, take a week, take two weeks, and just keep this jury, and say come back in two weeks and have three or four or them show up or whatever. *Their attention span is gone . . . .*

The court's determination that the jury's attention span could not withstand such delay must be given substantial deference. *See Washington*, 434 U.S. at 514 (noting that the trial judge is "most familiar with the evidence and the background of the case on trial" and "is far more conversant with the factors relevant to the determination than any reviewing court can possibly be." (internal quotation marks omitted)). Moreover, the record contains numerous arguments by defense counsel demonstrating how the Defendants were prejudiced by the discovery violations and how alternative remedies would have been inadequate to remedy such prejudice. One attorney noted that she would have opened the case differently had she known about the impeaching information. Another explained that if he called back witnesses who had already left the stand in

order to present the impeaching information, the jury would likely view it as "browbeating." As *Washington* makes clear, a manifest necessity determination can be upheld based on attorneys' arguments in the record even when the trial judge did not explicitly reference those arguments. *Id.* at 517 (upholding a determination of manifest necessity given with no explicit reasoning, because "[t]he basis for the trial judge's mistrial order is adequately disclosed by the record, which includes the extensive argument of counsel prior to the judge's ruling").

**[7]** Just as in *Washington*, "[t]he basis for the trial judge's mistrial order is adequately disclosed by the record." *Id.* at 517. The district court did not abuse its discretion in finding that the trial could not continue. Because the mistrial was supported by a valid determination of manifest necessity, it does not prohibit retrial under the double jeopardy clause and we therefore have jurisdiction to hear this appeal.

## B. *Dismissal of the Indictment*

**[8]** The district court did not abuse its discretion by dismissing the superseding indictment. An indictment may be dismissed with prejudice[4] under either of two theories:

> [First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due pro-

---

[4]The district court's order states only that the superseding indictment "is dismissed by the court," but it is clear from the record that the district court intended to dismiss the indictment with prejudice. The court had already granted a mistrial, and the only remaining question was whether the government would be entitled to retry Defendants. Accordingly, we interpret the district court's decision as a dismissal with prejudice. *See United States v. Brown*, 425 F.3d 681, 682 (9th Cir. 2005) (per curiam) (clarifying that an unspecified dismissal was "with prejudice" when that was the clear intent).

cess violation, the court may nonetheless dismiss under its supervisory powers.

*United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) (citations omitted). In this case, Defendants moved for dismissal solely pursuant to the court's supervisory powers.[5]

Generally, "[f]indings of fact underlying the dismissal are reviewed under the clearly erroneous standard." *Id.* at 1091. The government, however, argues that we should review the record de novo. In support, it cites *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840 (9th Cir. 2004), a civil case in which the district court excluded a witness who had not been disclosed in a timely fashion. *Id.* at 846. We reviewed the propriety of the sanctions de novo because the district court had failed to make factual findings as to whether the late disclosure was "substantially justified" or "harmless" under Federal Rule of Civil Procedure 37(c)(1). *Id.* at 845-46. Here, the government argues that "the district court failed to examine any evidence or make any findings of fact attendant to its dismissal of the indictment" and that de novo review therefore applies.

This argument fails because it is unsupported by the record. The district court *did* make specific factual findings, based on the totality of the proceedings before it, that "the Assistant U.S. Attorney acted flagrantly, willfully, and in bad faith"; that he had made "affirmative misrepresentation[s] to the court"; that the defendants would be prejudiced by a new trial; and that no lesser sanction could adequately remedy the harm done. It made these findings after reviewing the 34 pages of

---

[5]In granting Defendants' motion to dismiss, the district court applied the legal standard relevant to its discretionary supervisory powers, but also found that the government's errors "subvert[ed] the due process rights that the defendants are guaranteed by the Constitution." Because the district court did not abuse its discretion in dismissing the indictment under its supervisory powers, we need not consider whether the dismissal was also justified by the government's violation of Defendants' due process rights.

undisclosed materials admitted into evidence as "Hearing Exhibit 1" and after witnessing firsthand the AUSA's misrepresentations. While it is true that the district court did not review all 650 pages of undisclosed documents, such a review was unnecessary in light of the government's own concession that these were "all materials that we should have turned over." Accordingly, we reject the government's suggestion that the de novo standard of review is applicable, and we hold that the district court's findings were not clearly erroneous.

**[9]** A district court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991). However, because "[d]ismissing an indictment with prejudice encroaches on the prosecutor's charging authority," this sanction may be permitted only "in cases of flagrant prosecutorial misconduct." *Id.* at 1091. Here, the district court specifically found that the AUSA acted "flagrantly, willfully, and in bad faith." The government argues that the district court's finding of flagrancy cannot be upheld, because the court declined to find that the documents were *intentionally* withheld from the defense. The district court explained that realistically "[t]here is no way for the defendants to prove that the government acted intentionally. How would you prove that that had happened unless the prosecutor concedes that he or she deliberately withheld information?"

**[10]** We agree with the government that accidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior. *See United States v. Kearns*, 5 F.3d 1251, 1255 (9th Cir. 1993) (holding that even though the government's conduct "may have been negligent, or even grossly negligent," it did not rise to the level of flagrant misconduct). We have never suggested, however, that "flagrant misbehavior" does not embrace reckless disregard for the

prosecution's constitutional obligations. Here, although the case involved hundreds of thousands of pages of discovery, the AUSA failed to keep a log indicating disclosed and non-disclosed materials. The AUSA repeatedly represented to the court that he had fully complied with *Brady* and *Giglio*, when he knew full well that he could not verify these claims. When the district court finally asked the AUSA to produce verification of the required disclosures, he attempted to paper over his mistake, offering "in an abundance of caution" to make new copies "rather than find the record of what we turned over." Only when the court insisted on proof of disclosure did the AUSA acknowledge that no record of compliance even existed. Finally, the dates on many of the subsequently disclosed documents post-date the beginning of trial, so the government eventually had to concede that it had failed to disclose material documents relevant to impeachment of witnesses who had already testified. In this case, the failure to produce documents and to record what had or had not been disclosed, along with the affirmative misrepresentations to the court of full compliance, support the district court's finding of "flagrant" prosecutorial misconduct even if the documents themselves were not intentionally withheld from the defense. We note as particularly relevant the fact that the government received several indications, both before and during trial, that there were problems with its discovery production and yet it did nothing to ensure it had provided full disclosure until the trial court insisted it produce verification of such after numerous complaints from the defense.

The government misrelies upon *United States v. Cadet*, 727 F.2d 1453 (9th Cir. 1984), and *United States v. Gatto*, 763 F.2d 1040 (9th Cir. 1985), to argue that *Brady/Giglio* violations, no matter how flagrant, can never justify dismissing an indictment. In *Cadet*, the district court dismissed the indictment after the government failed to comply with an overly broad discovery order. 727 F.2d at 1470. We first held that "significant portions of the [district court's] order were invalid." *Id.* at 1454-55. "Because we . . . determined that the court

abused its discretion in ordering the government to comply with an order which is partially invalid, we . . . vacate[d] the judgment dismissing this action as a disproportionate sanction for the lack of good faith compliance by the government." *Id.* at 1470. In *Gatto*, the district court excluded certain incriminating evidence that it found had not been disclosed pursuant to Rule 16 of the Federal Rules of Criminal Procedure. 763 F.2d at 1043. The prosecution appealed the exclusionary sanction pursuant to 18 U.S.C. § 3731, but the district court insisted that the trial go forward despite the interlocutory appeal. *Id.* at 1044. The government refused to proceed until the appeal was decided, and the district court dismissed the indictment for the government's " 'flagrant refusal to abide by [the court's] previous orders.' " *Id.* We reversed the order excluding evidence, holding that the prosecution's late disclosure did not violate Rule 16 or any "constitutional provision, federal statute, [or] specific discovery order." *Id.* at 1046-49. We similarly reversed the dismissal, noting that the government had not in fact violated the court's discovery order. *Id.* at 1050.

**[11]** Neither *Cadet* nor *Gatto* suggests that a *Brady/Giglio* violation can never justify dismissing an indictment. Indeed, we have explicitly suggested to the contrary. *See United States v. Blanco*, 392 F.3d 382, 395 (9th Cir. 2004); *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993). In *Kojayan*, the government failed to disclose an agreement it had made with a co-conspirator whose statements were introduced at trial. *Id.* at 1317. We held that the failure to disclose this agreement violated *Brady*. *Id.* at 1322. Based on this violation, the prosecutor's misleading statements at trial, and the government's failure to accept responsibility for its wrongdoing, *id.* at 1322-23, we reversed the convictions and "remand[ed] for the district court to determine whether to retry the defendants or dismiss the indictment with prejudice as a sanction for the government's misbehavior," *id.* at 1325. In *Blanco*, the government failed to disclose "highly relevant impeachment material" about a confidential informant and we

found it "obvious" that the material "should have been turned over to Blanco under *Brady* and *Giglio*." 392 F.3d at 392. We remanded to the district court for further factfinding to determine the full extent of the *Brady/Giglio* violations, *id.* at 394, and noted that, on remand, "[a] range of options will be available to the court, including, at one extreme, dismissal of the indictment for governmental misconduct," *id.* at 395 (citing *Barrera-Moreno*, 951 F.2d at 1091). *Kojayan* and *Blanco* make clear that *Brady* violations are just like other constitutional violations. Although the appropriate remedy will usually be a new trial, *see Giglio*, 405 U.S. at 153-54 (explaining when the suppression of material evidence or the solicitation of false testimony justifies a new trial), a district court may dismiss the indictment when the prosecution's actions rise, as they did here, to the level of flagrant prosecutorial misconduct. Because the district court did not clearly err in finding that the government recklessly violated its discovery obligations and made flagrant misrepresentations to the court, we hold that the dismissal was not an abuse of discretion.

**[12]** Nor did the district court abuse its discretion by dismissing the indictment without reviewing all 650 pages of newly disclosed materials that the government did not even bother to introduce into the record until after the indictment was dismissed. An explicit finding that disclosure was required under *Brady/Giglio* as to each document was unnecessary given the evidence of numerous constitutional violations and the government's own concessions. The government admitted it had made "a very serious mistake in terms of [its] discovery obligations." It "acknowledge[d] that these materials, the six hundred and fifty pages of documents, are all materials that we should have turned over, we expect our prosecutors to turn over, and [the original AUSA] I think in large part acknowledges all those materials . . . should have been turned over." The government's opposition to the motion to dismiss conceded that "at least some potential *Giglio* material either was unaccounted for or had not been furnished in a timely manner" and focused on whether dis-

missal was "the appropriate remedy for untimely or inadequate *Giglio* disclosures."

**[13]** A court may dismiss an indictment under its supervisory powers only when the defendant suffers "substantial prejudice," *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988), and where "no lesser remedial action is available," *Barrera-Moreno*, 951 F.2d at 1092. The government has only proposed a single lesser remedy, the mistrial declaration itself, which it insists is an adequate sanction for the discovery violations. The district court considered and properly rejected that argument, because the mistrial remedy would advantage the government, probably allowing it to salvage what the district court viewed as a poorly conducted prosecution. The court identified myriad weaknesses in the government's presentation during the three-week trial. For example, many of the witnesses presented by the government had primarily implicated individuals other than the defendants, including two government witnesses who had already testified, Peter Berney and Doug Ansell. The court also noted that Berney, one of the government's main witnesses, had been substantially impeached with inconsistent prior statements on cross-examination. The court explained:

> If this case were to be retried, the government and its witness will not make that mistake again, and that's the advantage that the government gains by its actions here. It gets a chance to try out its case[,] identify[ ] any problem area[s], and then correct those problems in a retrial, and that's an advantage the government should not be permitted to enjoy.

> Now, I have to think that Peter Berney was supposed to be a strong witness against the defendants. . . . I guarantee you next time he would be a stronger witness. That would be true of all of them. They would all be better witnesses.

The district court is in the best position to evaluate the strength of the prosecution's case and to gauge the prejudicial effect of a retrial. *Cf. United States v. Hagege*, 437 F.3d 943, 953 (9th Cir. 2006) ("Having presided over the entire proceedings . . . , the district court [i]s uniquely positioned to evaluate the prosecutor's conduct."). Here, the case as originally prosecuted appeared to the district court to have been faltering. Therefore, the district court did not abuse its discretion in concluding that a dismissal was the only means of avoiding prejudice to the Defendants.

**[14]** Finally, in *Kojayan*, we made clear that "[i]n determining the proper remedy [for prosecutorial misconduct], we must consider the government's willfulness in committing the misconduct and its willingness to own up to it." 8 F.3d at 1318. As described above, the district court here did not abuse its discretion in finding that the government acted "flagrantly, willfully, and in bad faith" in misrepresenting its compliance with its discovery obligations. The court also emphasized the AUSA's unwillingness to take responsibility for his conduct:

> [F]or over two weeks of trial, the prosecutor consistently claimed that he had disclosed the required material to the defendants . . . . And I accepted that, I accepted [the AUSA's] statement as an officer of the Court and overruled the objection on several occasions. . . . Only after I excoriated the Assistant U.S. Attorney in the strongest terms did he then offer an apology to the Court, not a heartfelt apology, but simply a response to me. And finally I said, be quiet and listen to me because he was just saying, yeah, I'm sorry, I'm sorry, I'm sorry, and not really meaning it.

The prosecutor has a "sworn duty . . . to assure that the defendant has a fair and impartial trial," and his "interest in a particular case is not necessarily to win, but to do justice." *N. Mariana Islands v. Bowie*, 236 F.3d 1083, 1089 (9th Cir.

2001) (internal quotation marks omitted). In this case, the district court was clearly troubled by the government's conduct and its failure to own up to its actions. We are similarly troubled, both by the AUSA's actions at trial and by the government's lack of contrition on appeal. The government attorneys who appeared in the original AUSA's stead on the critical day of the hearing on the motion to dismiss the indictment told the trial court that they "took this matter extremely seriously" and conceded that the government made a "very serious mistake in terms of [its] discovery obligations." Before us, however, these same attorneys have attempted to minimize the extent of the prosecutorial misconduct, completely disregarding the AUSA's repeated misrepresentations to the court and the failure to obtain and prepare many of the critical documents until *after* the trial was underway. Instead, they claim for the first time on appeal that *none* of the 650 pages were required disclosures under *Brady/Giglio*. When the district court first indicated that it was inclined to dismiss the indictment, it noted that it was "concerned [that] any lesser sanction [would be] like endorsing [the AUSA's conduct]." *See Barrera-Moreno*, 951 F.2d at 1091 (noting that the court's supervisory powers can be used "to deter future illegal conduct"). The government's tactics on appeal only reinforce our conclusion that it still has failed to grasp the severity of the prosecutorial misconduct involved here, as well as the importance of its constitutionally imposed discovery obligations. Accordingly, although dismissal of the indictment was the most severe sanction available to the district court, it was not an abuse of discretion.

## C. *Denial of Fees and Costs*

**[15]** After the district court dismissed the indictment, Defendants moved for an award of fees and costs under the Hyde Amendment, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A Note). The Hyde Amendment provides that in a privately defended criminal case, the court "may award to a prevailing party, other

than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith . . . ." The district court denied the motion on two grounds: (1) Defendants were not "prevailing parties" because the dismissal was not a judgment on the merits, and (2) although the discovery violations were conducted with bad faith, the entire case was not "vexatious, frivolous, or in bad faith." Defendants timely cross-appeal this ruling.

"We review a district court's denial of a Hyde Amendment motion for abuse of discretion. An abuse of discretion is an error of law or a determination based on a clearly erroneous finding of fact." *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1181 (9th Cir. 2003) (footnote omitted).

**[16]** The district court correctly determined that Defendants were not "prevailing parties" under the Hyde Amendment. Although the amendment does not explicitly define the term, we have interpreted "prevailing party" to mean "one who has gained by judgment or consent decree a material alteration of the legal relationship of the parties." *Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002) (defining the term under the Equal Access to Justice Act) (internal quotation marks omitted); *United States v. Campbell*, 291 F.3d 1169, 1172 (9th Cir. 2002) (extending the *Perez-Arrellano* definition to the Hyde Amendment). There can be no doubt that a dismissal with prejudice materially alters the legal relationship of the parties, as it precludes the government from bringing a prosecution that it otherwise would be entitled to bring. However, our cases have also required a prevailing party to have " 'rec-eive[d] at least some relief *on the merits* of his claim.' " *Campbell*, 291 F.3d at 1172 (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 603 (2001)) (alteration in original) (emphasis added). In *Campbell*, for example, the defendant's charges were dismissed through his participation in a pre-trial diversion program. *Id.* at 1171. We held that this did not constitute

relief "on the merits of his claim" and hence Campbell was not a "prevailing party" under the Hyde Amendment. *Id.* at 1172.

[17] As the district court made clear, the dismissal was not an enforceable judgment on the merits of the case. The court dismissed the indictment based on the government's failure to disclose documents and the prosecutor's affirmative misrepresentations to the court. The district court never suggested that this prosecutorial misconduct was relevant to Defendants' guilt or innocence. Instead, the dismissal was purely intended to sanction the government's flagrant *Brady/Giglio* and procedural violations and the misrepresentations used to conceal these violations. As in *Campbell*, the relief was not based on the *merits* of the case (except as necessary to calculate prejudice), so Defendants are not "prevailing parties" under the Hyde Amendment.[6] Because this is sufficient in and of itself to affirm the district court's denial of fees and costs, we need not review the court's finding that the overall case was not "vexatious, frivolous, or in bad faith."

---

[6]This is not to suggest that a dismissal for flagrant discovery violations could not, in other cases, constitute a sufficient judgment on the merits to bestow a defendant with "prevailing party" status. The legislative history of the Hyde Amendment makes clear that it was intended to protect against some types of disclosure violations. *See* 143 Cong. Rec. H7786, H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Hyde) (noting that the amendment would apply when prosecutors "keep information from you that the law says they must disclose," when they "hide information," and when they "do not disclose exculpatory information to which you are entitled."). If documents were *intentionally* withheld to bolster the prosecution's case, that misconduct would be relevant to the defendant's innocence in that it would have a tendency to suggest weakness in the prosecution's case. Accordingly, a dismissal on those grounds could be a judgment on the merits for Hyde Amendment purposes. Otherwise, minor discovery violations would be relevant under the Hyde Amendment, but major violations—those sufficient to prompt dismissal of the indictment— would bar relief. That question, however, is not squarely presented in this case, so we leave it for another day.

## IV.   CONCLUSION

The district court did not abuse its discretion in dismissing the indictment. The government egregiously failed to meet its constitutional obligations under *Brady* and *Giglio*. It failed to even make inquiry as to conviction records, plea bargains, and other discoverable materials concerning key witnesses until after trial began. It repeatedly misrepresented to the district court that all such documents had been disclosed prior to trial. The government did not admit to the court that it failed to disclose *Brady/Giglio* material until after many of the key witnesses had testified and been released. Even then, it failed to turn over some 650 documents until the day the district court declared a mistrial and submitted those documents to the court only after the indictment had been dismissed. This is prosecutorial misconduct in its highest form; conduct in flagrant disregard of the United States Constitution; and conduct which should be deterred by the strongest sanction available. Under these facts, the district court did not abuse its discretion in characterizing these actions as flagrant prosecutorial misconduct justifying dismissal. Nor did it abuse its discretion in determining that a retrial—the only lesser remedy ever proposed by the government—would substantially prejudice the defendants.

   **AFFIRMED.**