CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE
I. INTRODUCTION
Due process demands that the Government disclose to a defendant all material evidence in its possession that is favorable to the defense. This disclosure must occur at a time when the evidence can be of use and value to the defendant. Sadly, the Government in this case failed to disclose the material evidence to Defendant in a timely manner. Inexplicably, the Government waited just days before trial to disclose almost 100,000 material documents that Defendant needed to expose the trial witnesses' motive and bias against him and to attack their character for truthfulness. The Government's untimely disclosure occurred way too late for Defendant to review such an enormous amount of material documents and use them at trial. The Court now has no choice but to dismiss the charges against Defendant with prejudice.[1]
II. FACTUAL AND PROCEDURAL BACKGROUND
A. The Charges
The First Superseding Indictment charged Defendant with possession of 37.7 grams of methamphetamine with intent to distribute and for counterfeiting obligations of the United States. (Dkt. 28.) The charges arise out of a search of an Anaheim, California residence, including Defendant's bedroom, that Orange County Sheriff's Department ("OCSD") deputies conducted on June 6, 2017. (See Dkt. 34 at 3-4.) In Defendant's bedroom, deputies found 37.7 grams of actual methamphetamine, *1057 pay-owe sheets, washed $1 bills, a counterfeit $100 bill, templates, a computer, and a printer. (Id. ) On August 16, 2017, a grand jury returned a one-count indictment charging Defendant with possession of methamphetamine with intent to distribute. (Dkt. 1.) On December 13, 2017, a grand jury returned the First Superseding Indictment, adding a second count for counterfeiting obligations. (Dkt. 28.)
B. The Orange County Inmate Informant Scandal
Defendant's principal defense against the charges is that the critical trial witnesses, namely the OCSD deputies who conducted or were involved in the search, have a motive and bias to overstate the evidence against Defendant. Defendant claims that the details of his several-year history with the OCSD deputies, including the deputies' involvement in a department-wide scandal involving inmate informants, is necessary to show their motive and bias.
The adversarial history between Defendant and the OCSD deputies began long before the June 2017 search. (See Dkt. 36 at 2-5.) According to Defendant, it began sometime before 2011, when OCSD deputies started an unlawful informant program at the Orange County jail. (Id. ) Specifically, OCSD deputies were involved in a systematic practice of surreptitious monitoring and illegally using inmate informants to elicit incriminating statements from represented defendants, in clear violation of their Sixth Amendment rights. See People v. Dekraai , 5 Cal. App. 5th 1110, 1141, 210 Cal.Rptr.3d 523 (Ct. App. 2016), as modified (Dec. 14, 2016) ("[I]t is clear [OCSD] deputy sheriffs operated a well-established program whereby they placed [inmate informants] next to targeted defendants who they knew were represented by counsel to obtain statements.").
The OCSD's illegal inmate informant program came to light in recent years through evidence obtained by criminal defendants who were the targets of the program. See id. Not surprisingly, a very public scandal resulted when the program was exposed. Because of the constitutional violations that inured from the illegal use of inmate informants, the OCSD, the Orange County District Attorney's office, and individual deputies have all been criticized, and in some instances vilified, by the media, politicians, the legal community, and members of the public. In addition, numerous investigations and prosecutions, including several serious murder cases, have been compromised and the charges dismissed.
To highlight one example, the OCSD's improper practices led a California trial court to recuse the entire Orange County District Attorney's office in People v. Dekraai , a mass murder case involving eight victims, seven of whom died. After extensive evidentiary rulings, the trial court found that the deputies had violated the defendant's constitutional rights by planting an inmate informant to elicit a confession. Dekraai , 5 Cal. App. 5th at 1137. The trial court also found that the deputies then either intentionally lied or willfully withheld material evidence about the informant program from the trial court. Id. Further, the trial court found that the deputies' conduct created a conflict of interest for the District Attorney's office, which "failed its responsibility to resolve the conflict of interest by protecting the rule of law and instead ignored OCSD's attempt to compromise [the defendant's] constitutional and statutory rights." Id. at 1138.
The California Court of Appeal affirmed the trial court's recusal of the entire District Attorney's office in November 2016. Id. In its opinion, the Court of Appeal found that the District Attorney's office was not only aware of the OCSD's grave *1058 misconduct, but also failed to produce information to defendants about the informant program. Id. at 1146. Because the District Attorney's office was complicit in the OCSD's wrongdoing, the Court of Appeal found that the District Attorney's office had violated the defendant's due process rights and could not fairly prosecute the case. Id.
Although the recusal of the District Attorney's office in a mass murder case was perhaps the most public and dramatic result of the inmate informant scandal, there have been many additional repercussions. For example, in June 2016, a defendant's conviction in a fatal shooting case, People v. Ortiz , Case No. 11CF0862, was overturned because the District Attorney had failed to disclose material evidence regarding the inmate informant program to the defense. (See Dkt. 88 at 4.) The conviction was overturned and a new trial was granted after four OCSD deputies, who were called by the defendant to testify about the inmate informant program, invoked the Fifth Amendment and refused to testify. (Id. )
Currently, several agencies, including the United States Department of Justice (the "DOJ"), are actively investigating the OCSD, individual deputies, and the District Attorney's office in connection with the inmate informant scandal.[2]
C. Defendant's 2012 Attempted Murder Charges
According to Defendant, the inmate informant scandal has a direct bearing on the instant case. Defendant claims that, when he was previously in custody at the Orange County jail, he was a target of the informant program. Deputies purportedly believed that Defendant was part of a white supremacist gang, and would routinely charge him with relatively minor crimes anticipating that he would then confess to more serious crimes to one of the inmate informants. Defendant sought to prove that he was subjected to these illegal practices in 2012, after he was charged by the District Attorney's office with attempted murder. He requested then that relevant discovery on the inmate informant program be disclosed. Ultimately, the District Attorney's office decided to dismiss the attempted murder charges, instead of complying with a court order to produce the discovery.
As relevant here, Defendant claims that the same OCSD deputies who were involved in the investigation of his 2012 attempted murder case were involved in the June 2017 search that gave rise to the instant charges-Deputy Bryan Larson and Deputy Bill Beeman. (Dkt. 36 at 2.) Defendant claims that these deputies feel aggrieved by the 2012 dismissal and since then have been trying to obtain a conviction against him. (Id. at 3.) So, according to Defendant, when the deputies found him with narcotics during the search, they had a motive and bias to overstate the charges and maliciously prosecute him for distributing methamphetamine. Defendant claims that the deputies knew the 37.7 grams of methamphetamine they found were for Defendant's personal use, but they recommended bringing much more serious charges for distribution of the drugs to obtain a lengthy prison sentence. Defendant further claims that the instant charges were first brought in state court, but the deputies convinced the federal government to take over the case so that Defendant would face a higher mandatory *1059 minimum sentence of ten years' imprisonment.
Defendant also notes that the deputies involved, including Deputy Larson, have taken inconsistent positions when questioned about the inmate informant program. In particular, Deputy Larson was one of the deputies who invoked the Fifth Amendment and refused to testify when he was called as a witness by the defendant in People v. Ortiz . (See Dkt. 88 at 4.) Despite his prior invocation of the Fifth Amendment, Deputy Larson was willing to testify about the informant program in this case, when called as the Government's witness. (See, e.g., Dkt. 72.) Defendant asserts that at a minimum, this inconsistency shows that Deputy Larson has a clear motive and bias in favor of the prosecution.
D. Discovery Requests and Orders Before Trial
When the federal government filed the indictment against Defendant, on August 16, 2017, it planned to call two of the deputies who conducted the search, including Deputy Bryan Larson, at trial. (See Dkt. 34 at 1.) Nevertheless, the Government did not produce to Defendant any evidence about these deputies and their involvement in Defendant's prior 2012 case or the OCSD's inmate informant scandal.
The Court was first apprised of the Government's potential discovery failures on December 15, 2017, when Defendant filed a motion requesting disclosure of documents relating to the informant program. (Dkt. 36.) Defendant argued that such documents were discoverable because they relate to the credibility of certain percipient witnesses, namely Deputies Larson and Beeman. (Id. ) Defendant also indicated that he had been asking the Government to produce the documents for several weeks. (Id. ) That same day, the Government filed a motion to exclude any mention of the inmate informant scandal at trial. (Dkt. 34.) When these motions were filed, trial was scheduled for January 9, 2018.
On December 21, 2017, and on December 27, 2017, the Court held hearings on the motions relating to the inmate informant scandal. (Dkts. 42, 48.) At the hearings, the Court ruled that evidence of the deputies' involvement in the informant program and their history with Defendant bears on their credibility as witnesses, specifically their motive, bias, and character for untruthfulness. The Court ruled that Defendant should be afforded the opportunity to inquire into any aspects of the inmate informant scandal that bear on the deputies' credibility, including Deputy Larson's prior invocation of the Fifth Amendment.
At the end of the December 21 hearing, the Court ordered the Government to disclose the requested discovery to Defendant. The Court also ordered an evidentiary hearing to determine the scope of Deputy Larson's testimony at trial. In light of the discovery ruling and the evidentiary hearing, the Government requested a continuance of the trial from January 9, 2018, to January 30, 2018. Defendant objected to any continuance and expressed a strong desire to promptly resolve the charges against him. Over Defendant's objection, the Court granted the continuance to allow sufficient time for the Government to produce discovery and to hold the evidentiary hearing. (Dkt. 44.)
On January 25, 2018, five days before the January 30 trial date, the Government filed another motion to continue the trial date, again citing the difficulty of producing discovery. (Dkt. 88.) The Government indicated that it had requested relevant, potentially discoverable documents from the Orange County District Attorney's office and the DOJ after the hearing on December 21, 2017. (Id. at 3.) The Government further represented that it had recently *1060 received the materials, but required a twenty-eight day continuance to review and produce the materials. (Id. ) The Government noted that the requested continuance would not violate Defendant's right to a speedy trial because, under the Speedy Trial Act, thirty-four days remained under the speedy trial clock. (Id. at 1.) In response, Defendant filed an opposition and a motion to dismiss the case for the Government's failure to comply with its discovery obligations. (Dkts. 89, 90.) Defendant argued that any continuance would have a prejudicial effect as he remained in custody pending the trial.
Over Defendant's objection, the Court again granted the Government's motion and continued the trial to February 27, 2018. (Dkt. 95.) The Court noted in its order, however, that it was troubled by the Government's conduct and its failure to gather and produce the material discovery to the defense in a timely manner. (Id. at 4.) The Government apparently had waited until the eve of trial before it even started requesting materials from the OCSD, the District Attorney's office, and the DOJ. The Government's dilatory conduct was particularly troubling because it was compromising Defendant's rights to compulsory process, confrontation, and a speedy trial. The Court ultimately found that the Government had not demonstrated diligent preparation for trial, and ordered that the twenty-eight day continuance would not be excludable time for purposes of the Speedy Trial Act. (Id. at 5-6.) The Court also denied Defendant's motion to dismiss without prejudice, but invited Defendant to renew his motion if the Government failed to meet its discovery obligations in advance of the new trial date. (Id. at 6.)
E. Defendant's Motion to Dismiss
On February 22, 2018, five days before trial was scheduled to begin, the Government lodged with the Court a manual, in camera , ex parte motion. (See Dkt. 104.) In its motion, the Government stated that it started producing materials to Defendant on February 15, and anticipated completing its production on February 22. (Dkt. 109 at 2.) The Government also attached to its motion two compact discs containing 20,681 documents and three video clips containing an hour and a half of footage. The Government conceded that the documents and videos were material to Defendant, but stated that these materials had not been produced because they were privileged or otherwise confidential. (Id. at 2.) The Government claimed, for example, that disclosure of certain materials could endanger the lives of current inmates and their family members. (Id. at 6.)
Notwithstanding the grave consequences that might result from disclosure, the Government belatedly asked the Court, five days before trial, to review the voluminous materials to determine whether any applicable privilege applies to each document and video clip. The Government also requested that any materials the Court orders disclosed be produced only to Defense counsel under the condition that Defense counsel may not disclose or discuss the materials with Defendant.
The next day, February 23, 2018, the Court held a pre-trial hearing to discuss the Government's motion. The Court expressed its frustration that the Government belatedly asked the Court to review an enormous amount of material and make important privilege determinations a few days before trial. Defense counsel then informed the Court that he had also belatedly received voluminous materials. The Government had not produced anything to Defendant until February 15. Then, within the span of a week, Defense counsel received approximately 75,000 documents with the caveat that Defense counsel may not disclose or discuss the materials with Defendant. Defense counsel argued that *1061 the production was not timely, as it was made one week prior to trial and Defense counsel did not have the benefit of reviewing the 75,000 documents with his client. Defense counsel represented that he had not been able to review most of the documents and it was not possible to complete his review before trial. The problem was compounded by the fact that the Government had yet to produce the over 20,000 documents that it submitted to the Court the day before. Because of the Government's actions, Defendant renewed his motion to dismiss the charges.
III. ANALYSIS
"A district court may dismiss an indictment for a violation of due process or pursuant to its supervisory powers." United States v. Kearns , 5 F.3d 1251, 1253 (9th Cir. 1993). Defendant argues that the Government's conduct here warrants dismissal under the Court's supervisory powers. "Dismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice." Id. Accidental or merely negligent governmental conduct does not constitute flagrant misbehavior, but a reckless disregard for a defendant's constitutional rights does satisfy the requisite standard. United States v. Chapman , 524 F.3d 1073, 1085 (9th Cir. 2008). Moreover, a court should exercise its supervisory powers to dismiss the charges "only when the defendant suffers substantial prejudice and where no lesser remedial action is available." Id. at 1087.
A. Flagrant Misbehavior
Unfortunately, the Government demonstrated a deliberate indifference and reckless disregard for its constitutional discovery obligations in this case. One of the principal, sworn duties of a prosecutor is to disclose to a defendant all material, favorable evidence, including impeachment evidence, in the Government's possession. Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Giglio v. United States , 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The evidence must be disclosed even if there has been no request by the defendant. Strickler v. Greene , 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In addition, the evidence must be disclosed "at a time when the disclosure would be of value to the accused." United States v. Davenport , 753 F.2d 1460, 1462 (9th Cir. 1985). Strict compliance with these discovery obligations is required for a defendant to be afforded due process and to meaningfully exercise his Sixth Amendment right to a fair and speedy trial and his right to call and confront witnesses.
Here, the Government repeatedly failed to meet its discovery obligations. First, the Government failed to adequately investigate whether any discoverable evidence existed until it was far too late. See Kyles v. Whitley , 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). A reasonable, competent prosecutor would have diligently obtained and reviewed any material evidence that might bear on the credibility of the trial witnesses. Strickler , 527 U.S. at 280, 119 S.Ct. 1936 (Favorable evidence "encompasses impeachment evidence as well as exculpatory evidence."); United States v. Alvarez , 358 F.3d 1194, 1208 (9th Cir. 2004) ("Evidence affecting the credibility of government witnesses is material under Brady ."). The prosecutor would have then produced the evidence, regardless of any request by the defendant or court order, in a timely manner so that the defendant has a meaningful opportunity to review and use the evidence at trial. See United States v. Houston , 648 F.3d 806, 813 (9th Cir. 2011) (The government complied with Brady when it disclosed the *1062 exculpatory evidence, "well in advance of trial," at a time when the defendant could make use of the evidence.); United States v. Frazier , 203 F.Supp.3d 1128, 1133 (W.D. Wash. 2016) (The government violated Brady when it did not produce impeachment evidence until the eve of trial, "at a time where disclosure is no longer helpful to the accused.").
The Government in this case, however, did not proceed reasonably and competently, and instead inexplicably and unapologetically delayed the disclosure of material evidence. According to the Government's own admission, it always intended to call two OCSD deputies at trial. One of the deputies, Deputy Bryan Larson, clearly has a history with Defendant and the inmate informant scandal, which have a direct bearing on his credibility as a witness. Given the very public nature of the scandal and the fact that Deputy Larson invoked the Fifth Amendment when he refused to testify about the scandal, the Government had to have known that there was evidence related to the scandal that could be favorable to Defendant. Nevertheless, the Government did not make any inquiry regarding this evidence, and instead waited several months after the indictment was filed before it even attempted to obtain the evidence. And the Government only attempted to obtain the evidence after Defendant made multiple requests and the Court ordered disclosure. The Government's actions do not reflect a diligent attempt to comply with its constitutional obligations. Instead, the actions reflect a deliberate indifference and reckless disregard for them.
But the Government's wrongful conduct continued even after it obtained the material evidence from the OCSD, the District Attorney's office, and the DOJ. First, the Government requested two continuances of the trial, citing the difficulty of reviewing and producing the voluminous materials it had obtained. The continuances prejudiced the Defendant, who remained in custody without bail pending trial and who made it clear to the Government and the Court that he wanted his trial to have occurred the previous year as originally scheduled. More troubling, the Government led the Court and Defendant to believe that, given the continuances, all material evidence would be produced to the defense and in enough time for Defendant finally to make use of it at the trial.
Then, the Government produced the evidence to Defendant in a manner that demonstrated blatant indifference and reckless disregard for Defendant's ability to use the materials at trial. The Government did not produce a single piece of the material evidence until February 15, 2018, approximately a week before the trial was scheduled to begin. The Government then dumped 75,000 material documents on Defense counsel within the span of a week. In addition, on the eve of trial, the Government dumped over 20,000 material documents and an hour and a half of video footage on the Court, requesting significant privilege determinations. It was downright disingenuous for the Government to expect the Court to review such a magnitude of material documents in such short order and then turn those documents over to the defense so Defendant could make use of the documents. Neither the Court nor Defendant possesses superpowers.[3]
*1063 B. Substantial Prejudice
The Sixth Amendment to the United States Constitution ensures every defendant "the right to a speedy and public trial," the right "to be confronted with the witnesses against him," the right "to have compulsory process for obtaining witnesses in his favor," and the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.
Each Sixth Amendment right is sacred, "necessary to a full defense," and "part of the due process of law." Faretta v. California , 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right to a speedy trial is fundamental and "it is one of the most basic rights preserved by our Constitution." Klopfer v. State of N.C. , 386 U.S. 213, 226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). It recognizes that criminal charges may subject a defendant "to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes." Id. at 222, 87 S.Ct. 988. "The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice-through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence." Faretta , 422 U.S. at 818, 95 S.Ct. 2525. The right to effective assistance of counsel also "plays a crucial role in the adversarial system embodied in the Sixth Amendment since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled." Strickland v. Washington , 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quotations and citations omitted). "In short, the [Sixth] Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it." Faretta , 422 U.S. at 818, 95 S.Ct. 2525.
A defendant should never be forced to give up any of these constitutional rights. Unfortunately, that is the result of the Government's actions here. Defendant's principal theory against the charges-indeed the only defense theory the Court has been made aware of-is that the evidence supports a finding of simple possession, not distribution, of methamphetamine. Defendant believes that the quantity of methamphetamine at issue, 37.7 grams, is too small to infer any intent to distribute the drugs. Defendant also believes that the deputies who found the drugs know that Defendant had no intent to distribute them, but they have a motive and bias to overstate the evidence. Given Defendant's adversarial history with the deputies and their involvement in the inmate informant scandal, Defendant had a good faith basis to present his defense theory to the jury.
The Government's conduct, however, compromised Defendant's right to prove up and present his theory to a jury. Defendant can only present his theory through the effective assistance of his counsel and after a meaningful review of the evidence produced by the Government-evidence that the Government concedes is material to the defense. But the late disclosure of almost 100,000 documents made it impossible to review the material evidence and use it against the key trial witnesses. Instead, the late disclosure of the documents left Defendant with two options: continue the trial, and give up his Sixth Amendment right to a speedy trial; or proceed with trial, and give up his Sixth Amendment rights to confrontation, compulsory process, and effective assistance of counsel. Either option denies Defendant his constitutional rights and the fair administration *1064 of justice. He clearly has suffered substantial prejudice by the Government's actions.
C. No Lesser Remedial Action
Dismissal of an indictment is a drastic remedy, and should be granted only where "no lesser remedial action is available." United States v. Barrera-Moreno , 951 F.2d 1089, 1092 (9th Cir. 1991). The Government has not proposed any lesser remedy that would be appropriate here. The reason for the Government not doing so is obvious-there is none.
The Government's belated and voluminous production of material documents on the eve of trial created an impossible situation and forced the Court to decide between either dismissing the charges or violating Defendant's constitutional rights. If the Court ordered the parties to proceed with trial as scheduled, Defense counsel would have been compelled to examine the witnesses without reviewing a significant amount of material evidence favorable to the defense. In other words, Defendant would have been denied effective representation and his right to call and confront the important trial witnesses.
If, on the other hand, the Court ordered a several-month continuance of the trial to allow Defense counsel sufficient time to review the material documents, Defendant then would have been deprived his right to a speedy trial. Under the Speedy Trial Act, the Government had only six additional days to bring the case to trial. A continuance of six days obviously would not have afforded Defense counsel adequate time to review the 75,000 material documents, plus the 20,000 potentially discoverable documents that had been submitted to the Court.
In short, either proceeding with the trial or continuing it would have violated Defendant's constitutional rights. Again, proceeding with the trial, Defendant is denied his Sixth Amendment right to call and confront the important trial witnesses. Continuing the trial, Defendant is denied his Sixth Amendment right to a speedy trial. The only option the Court has to preserve and protect Defendant's constitutional rights is to dismiss the charges and to do so with prejudice.[4]
IV. CONCLUSION
The Sixth Amendment to the United States Constitution demands that every defendant be given the right to a speedy trial , the right to compulsory process , the right to confront witnesses , and the right to effective counsel . These constitutional rights are not aspirational. Every defendant is entitled to them. Unfortunately, the Government denied Defendant those rights by failing to meet its discovery obligations in this case. The Court is left with no viable remedy but to dismiss the charges with prejudice. Accordingly, Defendant's motion to dismiss is GRANTED .

This Order supplements the Court's oral ruling given at the hearing on February 23, 2018.

A December 15, 2016, press release announcing the DOJ's investigation of the Orange County District Attorney's office and Sheriff's Department is available at: https://www.justice.gov/opa/pr/justice-department-opens-investigations-orange-county-california-district-attorney-s-office-0.

To make matters worse, the Government also imposed unreasonable restrictions on Defense counsel's review of the documents, requiring Defense counsel not to share or discuss the documents with Defendant. The Court is at a loss to understand how the Government can expect Defendant to meaningfully use the documents at the trial when he is not even allowed to look at them and discuss them with his counsel.

Any lesser sanction would also constitute an endorsement of the Government's misconduct and the unwillingness to take responsibility for its actions. See Chapman , 524 F.3d at 1088. The Court repeatedly expressed its frustration with the Government's failure to accept and execute its discovery obligations to produce the material evidence to the defense in a timely manner. The Court also gave several warnings to the Government that its failure would be grounds to dismiss the charges. Nevertheless, the Government continued to disregard its constitutional obligations. Indeed, instead of accepting responsibility, the Government argued to the Court that if Defendant has difficulty in reviewing the materials, Defendant is free to request a continuance. Needless to say, the Government's argument reflects a callous disregard for Defendant's right to a speedy trial.