**CONCUR; and Opinion Filed August 15, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-00421-CR
No. 05-13-00423-CR
No. 05-13-00424-CR
No. 05-13-00425-CR

**THE STATE OF TEXAS, Appellant**

**V.**

**ALBERT G. HILL III, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F11-00180-Q, F11-00182-Q, F11-00183-Q, and F11-00191-Q**

## CONCURRING OPINION ON REMAND

Before Justices Bridges, Brown, and Schenck
Concurring Opinion by Justice Schenck

I concur with the majority and write separately to explain why, in addition to the grounds

identified by the majority, I believe that the Due Process Clause provides another independent and

direct basis by which Hill's indictments are justifiably dismissed, and to amplify why I support the

decision to dismiss with—rather than without—prejudice in view of the relative dearth of authority

under Texas case law.[1]

---

[1] The majority cites *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004), and *In re Guerra*, 235 S.W.3d 392, 429 (Tex. App.—Corpus Christi 2007, orig. proceeding), in support of the conclusion that dismissal is proper. To be clear, I agree that *Neal* and *Guerra* support that conclusion, although they only directly address prosecutions for vindictiveness (*Neal*) or conflicts of interest (*Guerra*), both of which the trial court may have properly found here. I believe that conclusion is directly supported by due process considerations outlined in *Caperton v. Massey Coal,* 556 U.S. 869 (2009), and within the reach of *State v. Mungia*, 119 S.W.3d 814, 816–17 (Tex. Crim. App. 2003), which acknowledged other circumstances beyond vindictiveness and conflict of interest would support dismissal.

The record reflects that these cases began with a financial grievance between a father and son. It was Hill's father, not any victim or complainant, who submitted to the district attorney's office a letter accusing Hill and his wife of mortgage fraud. Further, there was evidence a law partner of Hill's father's counsel donated a total of $48,500 to Watkins's campaign. After Hill and his father settled their dispute, Hill became embroiled in a dispute with his former legal counsel, Lisa Blue, over more than $50 million in attorney's fees attributed to her representation of him. In the months leading up to Hill's indictments, Watkins called Blue to discuss "the Hills" and asked if she was "still interested in the indictments," and Blue held a fundraiser for Watkins and made sizeable, lawful contributions to him as her fee dispute with Hill proceeded to trial. In his motion to quash or dismiss the indictments, Hill presented evidence, presumably credited by the trial judge sitting as finder of fact,[2] indicating that Watkins pursued the indictments in retaliation for the civil litigations involving Hill's father and Blue, that a public servant made himself available to influence, and that the charges against him would not have been pursued other than as a political favor by the district attorney. When called to testify at the hearing on Hill's motion to dismiss, Blue invoked her Fifth Amendment right on all questions. Watkins first failed to appear and ultimately refused to answer any questions, invoking specious attorney–client privilege and work-product immunity objections.

**Due Process**

Texas elects its district attorneys on a partisan basis and leaves them to finance their campaigns from members of the general public, a tiny percentage of whom decide, for their own reasons, to contribute. Barring the explicit quid pro quo to constitute a "bilateral agreement" at

---

[2] As noted in the Court's opinion, the trial court found the evidence sufficient to take the unusual step of conducting a hearing into the district attorney's charging decision. Ultimately, owing to obstruction and obfuscation of that effort, the trial judge dismissed the indictments for confounding that hearing. As the trial court found facts sufficient to warrant the hearing and ultimately entered judgment dismissing the indictments without making proper findings of fact or conclusions of law, we must view the facts in a manner supportive of that judgment. *See Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018).

the time the money changes hands, there is generally no offense in a citizen lawfully contributing to an official's political campaign or otherwise engendering good will. *See, e.g.*, *McCallum v. State,* 686 S.W.2d 132, 139 (Tex. Crim. App. 1985). The problem, of course, as this case illustrates, is that the public official is obliged, thereafter, to discharge his duties impartially and in a manner consistent with due process and other rights of the parties affected by his or her decisions. The trial court was presented with evidence supporting the inference that the charging decision in these cases was rendered as a perceived favor to influential political contributors and would not otherwise have been pursued. *See Lerma*, 543 S.W.3d at 190 (reviewing court should construe inferences reasonably supported by the evidence in favor of the resulting judgment where no proper findings of fact obtain); *cf. State v. Terrazas*, 962 S.W.2d 38, 45 (Tex. Crim. App. 1998) (Keller, J. dissenting) (urging that "[p]rosecutorial misconduct rises to the level of a due process violation . . . if it significantly compromises the fundamental fairness of the proceedings" and where compensation scheme influences decision to prosecute).

The Supreme Court has struggled to delineate the outer limits of the improper influence concern insofar as it applies to elected judges, settling on an objective standard that avoids the question of whether the judge was actually biased in rendering a decision in favor of a contributor, posing the question as whether an objectively reasonable jurist under similar circumstances would be likely to be improperly influenced. *Caperton v. Massey Coal*, 556 U.S. 869, 886 (2009). While the prospect of a compromised judge is worrying enough, a trial judge's discretionary judgments are subject to review and correction on appeal, and appellate panels are themselves comprised of multiple members, offering greater assurance of independent review. A prosecutor, on the other hand, stands alone with largely unfettered charging discretion that, but for the highly unusual circumstances of cases like this one, is necessarily beyond any generalized form of meaningful judicial scrutiny. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 296, 311–312 (1987).

The record supports a conclusion that an objectively reasonable prosecutor under circumstances similar to those presented here would likely be improperly influenced. While political contributions within statutory limits are both lawful and regular, the concern here is not with Hill's father's counsel and Blue's decisions to support Watkins's campaign or promote his career, which they had every right to do. Rather, the concern is with the prosecutor himself and his apparent eagerness to curry Blue's favor, even going so far as to explicitly suggest "[t]here could be an indictment or are you still interested," while knowing of the ongoing $50 million fee dispute between Blue and Hill. Further, Watkins was alerted to the alleged mortgage fraud by Hill's father, rather than a crime victim, and the record contains the testimony of career prosecutors, whom the record does not reflect solicited or otherwise received improper influence, as to the tenuous nature of the case against Hill. From these facts, I agree with the majority that the trial judge could have readily based her decision on the grounds of vindictive prosecution and conflict of interest, given the competing interests of which Watkins appears to have been solicitous. But I believe that the due process violation as recognized in *Massey Coal* could serve as an independent and direct ground for dismissal. *See Massey Coal*, 556 U.S. at 886. A reasonable prosecutor, knowing of the facts known to Watkins prior to the time he approached the grand jury seeking the indictments, would have recognized he harbored a disposition of a kind that a fair-minded person could not set aside. *See id.* at 889.

**Dismissal with Prejudice**

I also write separately to explain why dismissal with prejudice is proper under the circumstances presented in this case: no complaint from the potentially aggrieved financial institution, no investigation outside the district attorney's office, non-elected prosecutorial staff signaling no cause to indict, and a district attorney openly signaling his amenability to outside influence. As noted, the Court's opinion examines the issues largely through the lens of selective

prosecution and conflict of interest jurisprudence developed before *Massey Coal*'s due process holding. 556 U.S. 869. I agree that those cases fit our situation, though less directly than *Massey Coal*'s standard of objectivity. On this latter standard, with our own jurisdiction, I believe it to be useful to examine how the question of dismissal with or without prejudice has been addressed in other jurisdictions that have confronted prosecutorial misconduct in a variety of settings, including a denial of due process. As detailed below, those cases can be read to support dismissal with prejudice where the misconduct is so egregious by its nature that a meaningful remedy is necessary to deter like misconduct or where, but for the misconduct, there would be no case to pursue. As either of those circumstances could be found to obtain here, we have no occasion to choose between them.

The highest court in Massachusetts faced somewhat similar circumstances in *Commonwealth v. Manning* where two federal officers working closely with a state prosecutor disparaged a defendant's counsel in an attempt to induce him to become an informant in their ongoing investigation of his client. *Commonwealth v. Manning*, 367 N.E.2d 635, 636–37 (Mass. 1977). The Supreme Judicial Court of Massachusetts concluded that, rather than crafting a balancing test, when there is a deliberate and intentional attack by government agents on the relationship between a defendant and his counsel, "[t]he focus must be rather on the remedy necessary to cure the impairment." *Id.* at 638. While the court rejected a per se rule, it found "[t]he indictment itself is so inextricably interwoven with the misconduct which preceded it that the only appropriate remedy here is to dismiss the indictment." *Id.* at 639. Since then, Massachusetts courts have developed some guidance on reviewing motions to dismiss with prejudice. A prosecutor's misconduct that is "egregious, deliberate, and intentional, or that results in a violation of constitutional rights" may give rise to presumptive prejudice such that dismissal with prejudice is the appropriate remedy. *See Commonwealth v. Cronk*, 484 N.E.2d 1330, 1334

(Mass. 1985). In deciding whether to dismiss with or without prejudice, courts must balance the defendant's rights against the need to preserve society's interest in the administration of justice. *Id.* at 1334. In *Commonwealth v. Cronk*, the court concluded the prosecutor's repeated failure to promptly comply with discovery orders was found to be inexcusable, but because the conduct appeared to be unintentional and occurred before trial was scheduled, the court remanded the case to the trial court for findings on whether the prosecutor's misconduct caused such irreparable prejudice that the defendant could not receive a fair trial if the complaint were reinstated. *Id.* at 1335.

The Ninth Circuit has also confronted this question in several opinions. It permits trial courts to dismiss indictments with prejudice under one of two theories: (1) "flagrant" government conduct that amounts to a due process violation that presumably requires dismissal with prejudice as a systemic deterrent or (2) as an expression of the court's supervisory powers to remedy a violation of a recognized statutory or constitutional right, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and to deter future illegal conduct. *See United States v. Chapman*, 524 F.3d 1073, 1084–85 (9th Cir. 2008). While accidental or negligent conduct is insufficient to establish flagrant misbehavior, reckless disregard for the prosecution's constitutional obligations may be sufficient. *Id.* at 1085. Additionally, a court may dismiss an indictment under its supervisory powers only when the defendant suffers substantial prejudice and when no lesser remedial action is available. *Id.* at 1087. The Ninth Circuit further noted that the trial court is in the best position to evaluate the strength of the prosecution's case and to gauge the prejudicial effect of a future trial. *Id.* Finally, in determining the proper remedy for prosecutorial misconduct, the court must consider the government's willfulness in committing the misconduct and its willingness to take ownership of it. *Id.*

The Ninth Circuit has also upheld dismissal with prejudice as a remedy for what amounts to discovery abuse, a form of misconduct that is less structural in its nature than the misconduct at issue here. In *United States v. Chapman*, the prosecutor failed to keep a log of what had been disclosed among hundreds of thousands of pages of discovery and repeatedly represented to the trial court that he had fully complied with his obligation to disclose potentially exculpatory evidence to the defense when there was no way he could have verified that claim. *Id.* at 1085. Although the prosecution received several indications that there were problems with its discovery production, it did nothing to ensure proper disclosure until the court insisted it produce verification of such. *Id.* Additionally, the trial court noted the prosecutor demonstrated little remorse when his misconduct was discovered, and the appellate court noted that the government's actions on appeal to minimize its misconduct and defend its actions "only reinforce[d] our conclusion that it still has failed to grasp the severity of the prosecutorial misconduct involved here." *Id.* at 1088. Under these circumstances, the Ninth Circuit affirmed the trial court's decision to dismiss the indictment with prejudice. *Id.* at 1090.

In *United States v. Govey*, a federal district court addressed not only deliberate indifference and reckless disregard for a prosecutor's constitutional discovery obligations, but also allegations that investigating officers convinced the federal government to prosecute the defendant in retaliation for the defendant's involvement in a scandal involving the investigating officers themselves. *United States v. Govey*, 284 F. Supp. 3d 1054, 1058, 1061 (C.D. Cal. 2018), *appeal docketed*, No. 18-50098 (9th Cir. Mar. 22, 2018). In *Govey*, the defendant was charged with possession of methamphetamine and counterfeiting obligations of the United States. *Id.* at 1057–58. The defendant's principal defense against the charges was that the critical trial witnesses, namely the investigating officers, had a motive and bias to overstate the evidence against the defendant because of his history with them, including a department-wide scandal involving illegal

inmate informants. *Id.* at 1057. The defendant requested disclosures from the government regarding the witnesses and the inmate informant scandal, but the government resisted and stalled, even after the trial court ordered the prosecutor to disclose. *Id.* at 1059–61. The district court found the government repeatedly failed to meet its discovery obligations and continued to engage in misconduct even after obtaining the material evidence by producing it in a manner that demonstrated blatant indifference and reckless disregard for the defendant's ability to use the materials at trial. *Id.* at 1062. The district court further found that the government's misconduct compromised the defendant's right to present his defense and that any lesser remedy than dismissal with prejudice would constitute an endorsement of the government's misconduct, unwillingness to take responsibility for its actions, and callous disregard for the defendant's right to a speedy trial. *Id.* at 1064 n.4.

From these cases, it is clear that the decision to dismiss an indictment with prejudice is appropriate where the misconduct is so egregious by its nature that a meaningful remedy is necessary to deter like misconduct or where, but for the misconduct, there would be no case to pursue. Both scenarios implicate *Massey Coal*'s due process concerns: that the impartial nature of the judicial system has been compromised to a degree or in a circumstance sufficient to warrant a deterrent remedy in order to restore neutrality to the process.[3]

A similar exclusionary rule grounded in a concern for the judicial process has been applied in Fourth Amendment cases where error has occurred. *See Mapp v. Ohio*, 367 U.S. 643, 659 (1961). That rule, now more than a century old, was necessary in order to avoid the Fourth Amendment being reduced to "a form of words." *Silverthorne Lumber Co. v. United States*, 251

---

[3] To the extent these cases suggest a concern for the integrity of the judicial process as a third basis for dismissal with prejudice, separate and apart from the concern about egregious misconduct and indictments that should not have been brought, I do not believe it is necessary to consider it here but note that a court should not routinely dismiss indictments simply because the court disagrees with the prosecutor's decision. One might question, for example, whether the Ninth Circuit's inclination toward supervisory authority has the potential of depriving the State of its right to enforce its laws because of mere error of the type that animated the State's early objections to the exclusionary rule discussed below.

U.S. 385, 392 (1920) (Holmes, J., barring use of unlawfully seized evidence before grand jury). The exclusionary rule was once criticized as potentially permitting a criminal to go free simply "because the constable has blundered." *Mapp*, 367 U.S. at 659 (responding to criticism by stating "[n]othing can destroy a government more quickly than its failure to observe its own laws"). More recently, reflecting that same concern and the deterrent object of the rule, the Supreme Court has clarified that it should apply only where some form of police misconduct beyond mere negligence is involved and where the benefits of deterrence outweigh its costs. *Herring v. United States*, 555 U.S. 135, 147–48 (2009).

I believe those same considerations apply and inform our analysis here. A prosecutor proceeding to take a case before a grand jury where the objective facts would indicate an undue influence casting a shadow over his judgment and that would otherwise not be pursued cannot be adequately remedied by simply observing the fact and starting over as if it had not happened.[4] Without some form of meaningful remedy, there would be no meaningful check on the very weighty institutional concerns that undergird *Massey Coal* and the right to due process that would otherwise be reduced to a hollow form of words. Prosecutors, unlike police officers, make decisions with the benefits of weeks or months of deliberation and with the benefit of extensive legal training. *See* TEX. GOV'T CODE ANN. § 41.001 (requiring district attorneys to be licensed attorneys). Where, as here, the prosecutor's decision to seek an indictment still reflects the kind of egregious misconduct that would serve as a basis for dismissal, the benefits of the deterrent would seem to outweigh the costs, particularly where the evidence before the tribunal would support the conclusion that the case would not have been pursued but for that misconduct. Further, prosecutors have considerable power and discretion in deciding not only *whether* to pursue any

---

[4] The implications of an indictment are no less severe than those following admission of improperly secured evidence. Even if the indicted defendant ultimately secures a not guilty verdict at trial, he will have endured months or years seated beneath its sword and may have suffered marital or career stress, in addition to the costs of mounting his defenses, for which the law can provide no remedy.

criminal charges against a target but how many charges might be pursued among the ever expanding panoply of criminal statutory prohibitions. *See* Paul H. Robinson, *The Rise and Fall and Resurrection of American Criminal Codes*, 53 U. LOUISVILLE L. REV. 173, 177–78 (2015). As others have noted, prosecutors also have the considerable coercive ability to pursue charges against associates and intimates and use pending charges as leverage in plea negotiations. *See United States v. McElhaney*, 469 F.3d 382, 385 (5th Cir. 2006); *see also, e.g.*, Dale A. Oesterle, *Early Observations on the Prosecutions of the Business Scandals of 2002-03*, 1 OHIO ST. J. CRIM. L. 443, 483 n.35 (2004) (describing prosecutor's tactic of "piling-on" as charging defendant with multiple offenses for same underlying misconduct). To be sure, abuses of these powers are likely exceptionally rare. Nevertheless, where a trial judge confronts evidence supporting the inference that the prosecutor is improperly influenced, some meaningful curb on these extraordinary powers is necessary.

In the instant case, the trial judge had ample evidence on which to base her decision to dismiss with prejudice on either a finding of egregious misconduct by the district attorney or a finding that but for his misconduct no case would have been brought.

*First*, Watkins solicited and retained significant financial benefits from those with a financial interest in any potential criminal proceedings against Hill, which are reminiscent of the contributions in *Massey Coal* that, even without proof of actual bias, "had a significant and disproportionate influence in placing" a judge on a particular case, requiring the judge's recusal. *See Massey Coal*, 556 U.S. at 884–86. While I do not mean to suggest that the receipt or solicitation of lawful campaign contributions, without more, would require recusal generally or dismissal of the indictments in this case, the financial interests involved here are hardly alone. *Cf. Terrazas*, 962 S.W.2d at 45.

*Second*, Watkins had an extraordinary 37 calls with Blue around the time of the indictments, including at least one call in which he openly inquired whether she was still interested in the indictments despite his awareness of her $50 million fee dispute with Hill. They also met for dinner on numerous occasions, including the evening before the indictments were returned.

*Third*, the record contains the unfortunate and inconsistent testimony of career prosecutors as to the validity of the case against Hill and the evidence in this case. At the hearing on Hill's motion to dismiss, assistant district attorney Stephanie Martin initially testified that from the moment she got the complaint, in her mind, she had a good case and was "always presenting it to the Grand Jury." She was subsequently impeached with handwritten notes she made about her conversations with the Hill trust's attorney David Pickett. Her notes reflect that she told Pickett that after doing research, she did not see how she could prove his criminal case at that time. The judge asked Martin, "The bank is not interested in prosecuting, and your client is not a victim; that's what you told Mr. Pickett?" Martin responded, "Yes." In addition, Martin later went back and added to her notes the following: that she had talked to Pickett multiple times since her original note and that he was okay with not indicting "for the trust as a victim" and going forward with indictments listing the bank as the victim. Martin acknowledged she "probably" added that note sometime after Hill filed his motion to dismiss.

*Fourth*, the timing of the letter from Hill's father accusing Hill of mortgage fraud and the heated exchange of calls between Watkins and Blue would support an inference that forces outside the district attorney's office were at work.

*Fifth*, the record shows a farcical game of hide and seek played by Watkins when he was called to testify,[5] resulting in the trial judge's ultimately being forced to hold him in contempt.

---

[5] Hill's own former attorney, the only other party to the communications concerning the indictments of Hill, pleaded the Fifth even after the court limited the questioning to her representation of Hill.

Based on the foregoing record, the trial judge could have inferred that Watkins was seeking to please parties interested in the proceeding under circumstances that implicate an improper motivation. *See Massey Coal*, 556 U.S. at 886.

From the evidence of Watkins's courting the outside influence over the investigatory and charging decisions from parties known to be financially adverse to Hill, all without any complaint from or showing of harm to the lender, the trial judge could have readily found that Watkins denied Hill the right to an impartial and disinterested prosecutor in violation of his due process rights. The trial judge could have inferred that, but for the relationship Watkins nurtured with Blue, no prosecution would have been pursued. Also, and separately, the trial judge here could have readily concluded that simply returning the State and the defendant to the natural *status quo ante* would have resulted in no prosecution at all.[6] This was not a case in which a crime victim or the police brought forward a charge that was thereafter mishandled by an overly aggressive or inept prosecutor. But for the misconduct here, there would likely have been no prosecution to pursue. Consequently, the trial court did not err in dismissing the indictments with prejudice.

Accordingly, I concur in the majority's decision to affirm the trial court's order dismissing the indictments with prejudice.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

130421CF.P05

---

[6] I recognize that the Grand Jury returned true bills indicting the Hills. The Grand Jury's true bills do not erase the taint in the presentment of the charges in the first instance. The fundamental role of the prosecutor is to exercise a fair and independent analysis to determine which matters should be brought before a Grand Jury. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.09 cmt. 1, 2. Otherwise, a prosecutor would simply bring forward 100% of the complaints of penal code violations, and the State would resemble a science fiction horror film. Some observers urge that the Grand Jury filter too readily lends itself to true bills, prompting the of-repeated observation that even a minimally competent prosecutor would face little difficulty in convincing a grand jury to "indict a ham sandwich." *Comparative Law Without Leaving Home: What Civil Procedure Can Teach Criminal Procedure, and Vice Versa*, 94 GEO. L.J. 683, 698 (2006); *see also Kerns v. Wolverton*, 381 S.E.2d 258, 262 n.4 (W. Va. 1989) ("Tom Wolfe reflected on this perception in his novel *The Bonfire of the Vanities* . . . ."). In all events, the grand jury's determination of probable cause does little to ameliorate the manifest problems with the pursuit of this matter in the first instance.